# CASES

# SUPREME JUDICIAL COURT

---

## DANIEL FLETCHER *vs. Inhabitants of* BUCKFIELD.

The *statute of* 1838, *c.* 311, entitled "An additional act concerning the public money apportioned to the State of *Maine*," empowers the respective towns to distribute the amount of the money received under the act of 1837, *c.* 265, among the inhabitants of the town, *per capita*, whatever appropriation or disposition thereof had been previously made by the town under the act of 1837.

ASSUMPSIT on a town order of which the following is a copy.

"No. 2. *Buckfield, May* 21, 1838. To *Jonas Spaulding*, Treasurer, or his successor, Pay *Daniel Fletcher* nineteen dollars and eighty cents, it being his proportion of the surplus money, proportioned to said town by the State of *Maine*, payable at the Treasurer's office in said *Buckfield*.

"$19,80

"*Noah Prince*,   ⎱ Selectmen of
"*Henry Decoster*, ⎰ *Buckfield*."

On the same day the order was presented to the treasurer of the town for acceptance and payment, and he refused to accept or to pay the same. The facts were agreed by the parties, and from them it appears, that the town voted to purchase a farm for the support of the poor and to pay therefor out of the money received from the State, called surplus revenue money ; and that a farm was purchased by the town for the sum of 2888,70, and paid for with

that money, and the residue thereof, 347,31, was expended by the Selectmen without vote of the town for such purposes as the town has a legal right to raise money to discharge, by taxation. This was prior to 1838.   On the thirtieth day of *April*, 1838, at a legal meeting of the town, called by a warrant wherein were articles " to see if the town will vote to distribute the whole of the town's share of the surplus revenue money, so called, all that was received of the State, agreeably to the census as taken by the Selectmen of said *Buckfield, March* 1, 1837 ; to see if the town will authorize the Selectmen to draw orders on the treasurer of said town for each person respectively entitled to a share of said surplus money according to said census ;" it was " voted to distribute the whole of the surplus revenue money ;" voted to instruct the Selectmen to grant to each individual, orders on the treasurer for their share of the surplus money agreeable to the census of *March*, 1837." Previously to passing this vote, on the 24th of *March*, 1838, the town at a legal meeting, one article in the warrant being " to see if the town will vote to distribute *per capita* the surplus revenue which they received from the State of *Maine*," " voted to distribute the surplus revenue *per capita* which we received from the State."

The case was argued in writing by *L. Whitman*, for the plaintiff, and by *S. F. Brown*, for the defendants.

*For the plaintiff* it was said, after stating the facts, that payment was resisted by the defendants on the ground, that they had, under the act of 1837, *c.* 265, appropriated for town purposes all their proportion of the money previously to the passing of the act of 1838, *c.* 311.

This cannot prevent the town from disposing of the money in the manner provided in the *statute* of 1838, distributing the same among the inhabitants of the town according to numbers. This money, when received by the defendants, was received as a deposit merely.   The faith of the State was pledged to the *United States* for the safe keeping and repayment, and the town was pledged to pay the amount received into the treasury of the State, whenever required so to do, to meet the demand of the Secretary of the Treasury upon the State.   The towns under this law had a right to use the money in the manner pointed out in the *statute*,

Fletcher *v.* Buckfield.

but they had no power to change its character.  They could by no vote of theirs make the money their own.  It was not a bequest but a loan ; and the town might, under this law, use the money, but they must account with the Legislature for it, whenever lawfully required so to do.  Before the law of 1838, the right of property in the surplus revenue, as between the towns and the State, remained with the State, the right of safe keeping and use only having been yielded to the towns.

Under the act of 1838 the towns are exonerated from all liability imposed on them by the act of 1837, and are authorized to distribute the same *per capita.*  The character by this last act is changed from a loan or deposit to a donation, and the towns have full authority to dispose of it finally by dividing the money among the inhabitants according to numbers.

The act of 1838 is not unconstitutional, as impairing the obligation of contracts.  It cannot be a violation of contract on the part of the State to relinquish a clear right of property in the money, and to authorize the other party to dispose of it.  The money, under the first act, did not become the property of the town, and the State might recal it at any time, and if so, might authorize the town to dispose of it in any mode whatever.

*For the defendants* it was contended, that they are not holden on the order, having been drawn on a particular fund which the plaintiff, at the time, well knew had no existence.  If the transaction supposed any indebtedness, it was in the fund and not in the drawers.  The order is therefore void, as to any obligation on the drawers, no consideration having passed from the plaintiff to the defendants.

By the *stat.* 1837, *c.* 265, towns are authorized to appropriate their proportion of the surplus revenue or any portion thereof, to the same purposes that they have a right to appropriate moneys accruing in their treasuries, by taxation.  With this legal authority the defendants appropriated their portion of that revenue to purposes recognized in that statute.  The town had a right by law to raise money by taxation for the purpose of purchasing a farm for the support of the poor.  The money had been appropriated before the act of 1838, and the town had no power under that act to appropriate it anew.  The appropriation to purchase a poor

farm is as much a disposition of the money, as the division of it *per capita.* If one legal disposal be no bar to another, and the people can be taxed to bring money into the treasury of the town to be thus divided, the same may be repeated, and one distribution *per capita* may be followed by another, and another, till the majority are surfeited, and the minority stript of all their property. The defendants insist that the power given by the law of 1838 to distribute *per capita,* is limited to cases where the money remained on hand or had been loaned out, and does not authorize the raising of money to distribute *per capita,* where the surplus money had been before appropriated for the purposes allowed by the act of 1837.

If this be not the true construction of the act of 1838, then it is unconstitutional and void. It is both *ex post facto* in its operation, and impairs the obligation of contracts. The town received and appropriated the money under the law of 1837, and paid it away. But for the law of 1838 the money was legally disposed of, and no power, but one acting retrospectively, can reclaim it for a new appropriation. All money legally expended under the law of 1837 lost the character forever of "surplus revenue" money. To resume the power over it, brands the act with that character which the constitution most emphatically condemns.

By THE COURT. — WE are of opinion that according to the agreement of the parties, a default should be entered, and that judgment be rendered for the plaintiff for the whole amount sued for, and refer for the reasons, which have led to this conclusion, to the opinion of the court in the case of *Davis* v. *the Inhabitants of Bath,* in the county of *Lincoln,* in which a similar question was presented.